STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. THE CITY OF ATLANTIC CITY, DEFENDANT-RESPONDENT.

Argued January 7, 1957—Decided February 4, 1957.

*Mr. Thomas P. Cook,* Deputy Attorney-General, argued the cause for the appellant (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

*Mr. Murray Fredericks* argued the cause for the respondent.

The opinion of the court was delivered by

VANDERBILT, C. J.   This is an appeal by the State of New Jersey from a judgment of the Law Division of the Superior Court in favor of the city of Atlantic City.  The question to be resolved is whether Atlantic City should be permitted to retain all of the federal grants-in-aid of beach protection projects received by it or whether the State is also entitled to benefit from these federal funds on the projects on which it shared a portion of the cost.  We granted the State's petition for certification, 22 *N. J.* 229 (1955), because of the important public issue involving the relationship among these three divisions of government with respect to a matter of common concern to all.

In 1940 the State of New Jersey initiated a general program to preserve beaches along the Atlantic Coast of this State from the erosive effects of the ocean, *L.* 1940, *c.* 52, *N. J. S. A.* 12 :6A–1, *and note, et seq.*   That act contemplated that federal funds, as well as state and local funds, would be used in these projects.  The act did not expressly relate to the city of Atlantic City and it does not appear that the city obtained any benefits under it, but it is, nevertheless, of importance here as an indication of legislative intent.

Then, by *L.* 1944, *c.* 93, the Legislature, "in furtherance of the public policy of the State and to meet the present problem of beach erosion," appropriated $1,250,000 for beach protection projects to be approved by the Governor. This act provided that the State would allot "not in excess of fifty *per centum* (50%) of the cost" of such projects to the county or municipality of a project approved for state aid. The act also provided that "the applicant shall bear the remaining fifty *per centum* (50%) or such excess thereof of the cost of such project or projects" and also that it "shall detail the proper county or municipal appropriation from which its share of the cost of the project shall be paid." Under this act the supervision and control of these projects was left to the applicants for aid after approval by the State Department of Commerce and Navigation, the agency charged with the responsibility of administering the fund appropriated. Atlantic City received from the State, pursuant to this act, the sum of $187,915 which represented one-half the cost of a hydraulic beach fill.

By *L.* 1946, *c.* 258 (*N. J. S. A.* 12:6A–2), the Legislature amended *L.* 1940, *c.* 52, *supra*, and supplemented it so as to provide that all moneys appropriated by either the Federal Government, the State, or any county or municipality for the purpose of beach erosion and beach protection should be expended under the direction of the State.

In this same year the Congress of the United States provided for financial assistance for beach protection measures undertaken along the shores of the United States, *P. L.* No. 727, *79th Congress, Second Session,* approved August 13, 1946, 33 *U. S. C. A. sec.* 426e. This law provided that the federal contribution could not exceed "one-third of the total cost." It also required that the plan of protection be specifically adopted and authorized by Congress after investigation and study by the Beach Erosion Board, a federal agency. Atlantic City applied for federal aid and cooperated with the federal agency, to the extent of about $10,000, in a joint study of its beach protection program and policy. As a result of the study and investigation, it was recommended and approved

by the appropriate federal agencies that the United States should participate "in defraying the cost of the construction to the full one third of the total first cost of the work."

The federal assistance was not without conditions. Atlantic City had to give assurance that water pollution from sources within its jurisdiction would not be permitted and that the public use of the beaches would not be curtailed. It had to accept responsibility for maintenance and repair of the works throughout their useful life, provide the necessary lands, easements and rights of way and make provision for claims for damages that might arise as a result of the work.

The policy of the State with respect to the supervision and control of these beach projects to which it was contributing was soon changed. Subsequent appropriation acts, beginning with *P. L.* 1947, *c.* 67, provided for supervision and control by the State and ultimately required the municipality to deposit its share of the cost of the project with the State Treasurer, *P. L.* 1948, *c.* 117, *p.* 813; *P. L.* 1949, *c.* 43, *p.* 310; *P. L.* 1951, *c.* 49, *p.* 378; *P. L.* 1952, *c.* 43, *p.* 341; *P. L.* 1953, *c.* 102, *p.* 1255.

In 1954, by *P. L.* No. 780, *83rd Congress, Second Session,* approved September 3, 1954, 68 *Stat.* 1248, § 102, the Secretary of the Army was authorized "to reimburse local interests for such work done by them on the beach erosion projects * * * subsequent to the initiation of the cooperative studies which form the basis for the projects." Then, by the Public Works Appropriation Bill for the fiscal year 1956, 69 *Stat.* 361, $906,000 was appropriated for the Atlantic City projects.

In the meantime, beginning with the year 1947 the New Jersey Legislature passed a series of annual appropriation acts appropriating certain sums for beach protection measures along the Atlantic Coast. They all provided that "fifty *per centum* [50%] of the cost of each project shall be borne by each municipality participating in the project." As already indicated, these acts changed the policy in force under the 1944 act. The 1947 act, *L.* 1947, *c.* 67, declared that all projects should be constructed "under contract and super-

vision of the Division of Navigation." Beginning with the 1948 act, *L.* 1948, *c.* 117, each of the acts contained a provision requiring that the 50% share of the participating municipality be deposited with the State Treasurer.

In addition to seeking aid from the Federal Government, Atlantic City also sought state aid under one or more of these annual appropriation acts. Five projects were completed with state assistance under these acts, on which each party spent a total of $682,405.91.

The total expenditure by the State of New Jersey under the 1944 act, $187,915, and under the later acts, $682,405.91, was $870,320.91. The total cost of all the projects was $1,740,641.82. Of the fund made available by the federal grant-in-aid, $580,213.94, representing one third of the total cost (in these figures the difference of $.23 is unexplained and immaterial) is now in dispute. The city claimed the entire amount of the federal reimbursement, while the State claimed that this sum of $580,213.94 should be delivered to it in accordance with the requirements of state policy and law, and that it in turn would repay one half of the federal fund to the city as its share. In that way, the State claimed, each party would be bearing only one-half of the cost of these projects according to the dictates of the state statutes.

This action was brought to determine the respective rights of the parties, and it has been stipulated between them that the sum in issue be held by the city on deposit in escrow pending the final outcome of this action.

The matter came on to be heard as the result of motions by each party for summary judgment, and in disposing of the matter in favor of the city the trial court found that there was a contractual arrangement between the parties and "at no time was any promise exacted from the city of Atlantic City, either expressed or implied, that the city should be obliged to make any refund or reimbursement to the State at any time"; that the action of the city in diligently availing itself of federal aid involved no commitment or obligation to the State, but that the city "made two separate independent contracts which are in nowise connected, which

are thoroughly unrelated, solely and excepting for the fact that they had to do with the same work."

The position of the State is that the state statutes here involved expressly require the city to bear one-half of the "cost" of the projects and this mandate would clearly be violated if the State were to pay 50% of the gross cost while the city only paid one-sixth of the cost because of the contribution to it by the Federal Government of one-third of the total cost, particularly since the state laws contemplated federal assistance. It contends that the appropriation acts must be construed to mean that if either party receives federal aid in defraying a portion of the cost of the projects, such funds must be applied against the "total cost" so that the parties will in fact each bear only one-half of the "cost." The State further maintains that the relationship between it and the city is not one of contract, as envisioned by the trial court, but is rather a joint undertaking by the sovereign and a political subdivision of the State as an auxiliary in the performance of a governmental function for the good of the general public. It urges, therefore, that any contract made by either party with the Federal Government should be deemed entered into on behalf of both the State and the participating municipality and any assurance given by the contracting party likewise considered as a joint undertaking.

The city of Atlantic City, on the other hand, contends that it was only political subdivision that could legally obtain from the Secretary of the Army that part of the appropriation now held in escrow and it is therefore entitled to retain the full amount of it to the exclusion of the State. This argument is predicated upon the idea that these beach projects were the city's own projects to which the State had merely contributed to one-half the cost, and that since the city alone had obligated itself to the Federal Government and had alone cooperated in the joint survey without any help from the State, it alone had satisfied the conditions of the federal grant and was therefore alone entitled to the federal fund.

The city also urges that there never was any intention on the part of the State to impose any condition that these

federal funds be applied to reduce the total cost of the project so as to permit a *pro rata* sharing in the federal grants by both the city and the State; that the only condition to the offer of the State was that the city post an amount equal to the grant of the State and this was done. It says that the fact that the State did not protect itself either by legislative enactment or by executive or administrative rules and regulations must operate against the State, and that its deficiency cannot now be remedied by judicial decision.

It remains to mention that the problem of protection against beach erosion was originally conceived of as a municipal function, though sometimes this legislation looked forward hopefully to contributions from the State or the county to help pay the cost. Such legislation antedates by several decades the statutes involved in the present suit. Thus, *R. S.* 40:92–9 gives broad powers to boroughs to protect their ocean and beach fronts by the erection of bulkheads and jetties and to repair and maintain them, and section 11 thereof provides that the borough may accept contributions from the State or county to help pay the cost. This statute had its source in *L.* 1915, *c.* 12, which was in turn a supplement to *L.* 1897, *c.* 161. See also *R. S.* 40:56–1, which authorizes any municipality to undertake as a local improvement (defined as one, the cost of which or portion thereof may be assessed upon lands in the vicinity) the "improvement or reimprovement of any beach or water front, and the providing of suitable protection to prevent damage to lands or property by the ocean or other waters, including the filling in and grading necessary for the protection of such improvements" (*par.* h), and the "reclaiming, filling and improving and bulkheading and filling in lands lying under tidal or other water * * *" (*par.* p). This statute had its origin in *L.* 1917, *c.* 152. Attention should also be called to *R. S.* 40:55A–1 and 5, which created a beach commission of four residents in every municipality under the control of the municipal finance commission and which owns the beach, and vested the beach commission with all the powers pre-

viously vested in the governing body of such municipality relating to the construction and maintenance of piers, bulkheads, jetties and the like. This statute had its origin in *L*. 1936, *c*. 160. *R. S*. 40:29–10 authorizes the board of chosen freeholders of any county and the governing body of any municipality bordering on the Atlantic Ocean to enter into an agreement whereby the board shall agree to pay to the municipality such sum toward the erection or repair of seawalks, bulkheads and jetties up to 15% of the total appropriation therefor. This statute has its origin in *L*. 1936, *c*. 255. It was not until 1944 (*c*. 93, *supra*) that it became permissible for the State to assume responsibility for "not in excess of fifty *per centum* (50%) of the cost" of such project. This change in the relationship of the parties to such projects over the years is important in construing the legislative intent in this field.

It is also to be noted that the court was advised at the oral argument that it had been stipulated that litigation similar to that now before us involving Cape May and Ocean City should be governed by the outcome of this case.

A review of the relations between the State and Atlantic City (especially in the light of the earlier statutes which cast the entire responsibility for protection against beach erosion on the municipality) reveals very clearly that the Legislature never intended that the State would become responsible for more than one-half of the cost of the improvement. Nor did the Legislature ever intend that Atlantic City should pay less than one-half of the cost of the improvement. There is no indication of ambiguity in the statutes under review on this fundamental point.

Moreover, if the parties to the arrangement had been private parties, and not the State and one of its political subdivisions, they would clearly have been treated as partners, with an obligation on the part of the city of Atlantic City to account to the State for the proportion of the fund received by it from the Federal Government, which would otherwise reduce its payment below the 50% it had obligated itself to pay to the State. A partner cannot be permitted to

enrich himself at the expense of his partner; citation of authority on such an elementary point is unnecessary.

There is no need to catalogue all the principles of partnership law. It need only be pointed out that in every such relationship the act of one of the parties in the course of and in furtherance of the joint undertaking is an act for the benefit of all the parties to the relationship. Neither party will be permitted to use the joint enterprise to benefit himself to the exclusion of his partner except by consent of the latter.

The doctrine of accountability applies with even greater force here, first, because parties to the transaction are not merely private parties, but a sovereign state on the one side and, on the other, one of its political subdivisions which owes not only its life but its continued existence and the terms on which it shall live to the State. Secondly, the State has here assumed as a grant or gratuity a limited obligation of 50% of the cost to particular beach protection projects conditioned on a like payment toward the cost by Atlantic City. As between the sovereign state and one of its political subdivisions, any doubt should be construed in favor of the sovereign state. Where the payment by the sovereign state to its political subdivision is a mere gratuity, that construction should be adopted which does not extend the scope of the gratuity beyond its obvious intent. Atlantic City cannot be permitted by any maneuver against its partner, the sovereign state, to reduce its liability for these improvements from one-half to one-sixth of the cost thereof.

Nor is there any need for us to look at the federal acts under which aid was given; the simple answer is to be found in our own laws. The statutes setting up the appropriations for beach protection projects were nothing more than an invitation by the State to its lesser subdivisions to join with it in joint undertakings for the benefit of the localities affected and for the general benefit of the people of New Jersey as a whole. Obviously, since municipalities along the Atlantic seaboard of our State would be the direct and immediate beneficiaries of any such improvements, al-

though the general public of the State also benefits thereby, the Legislature saw fit to make an equal division of the financial burden a requirement of the grant by the State. Upon acceptance of these offers, the city became a partner with the State, not in the strict sense of the word, but in the sense that they were jointly participating in an enterprise that was looked upon as being mutually profitable to both in the form of benefits to the public at large and the residents and businessmen of the seacoast municipalities. Upon acceptance of the State's offer, the city of Atlantic City became entitled to all the rights that would flow from such a relationship and likewise bound by all of the obligations incident to it.

This fundamental concept is apparent not only in the express language of these statutes, but is inherent in the express over-all policy of the State to meet the problem of beach erosion by a sharing of the burden of these protective measures with the local political subdivisions immediately involved since the interests of both were concerned. A sharing of the burden as well as a sharing of the benefits is the main characteristic element of a joint undertaking or a partnership.

The State of New Jersey like the city of Atlantic City, was one of the class of parties to be benefited by the federal grants, and there is no indication of any intention on the part of the Federal Government to favor one interest as against the other. The federal grant-in-aid was to the *total* project, leaving the balance to be provided for by State and for local interests. Thus, when the city applied for all the federal aid which was available to both, it precluded the State from obtaining any of the federal aid on the same project.

The judgment below is reversed.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, JACOBS and WEINTRAUB—4.

*For affirmance*—Justices OLIPHANT, WACHENFELD and BURLING—3.